IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MATT GERALD GREEN,
                  Petitioner          :

    v.                           : CIVIL ACTION NO. WDQ-03-1318

WILLIAM B. SONDERVAN, *et al.,*    :
                Respondents

## MEMORANDUM

Pending is the counseled Petition for Writ of Habeas Corpus of  Matt Gerald Green, Paper No. 1, the State's Answer and exhibits, Paper No.  9, and Green's reply and brief in support of the petition, Paper No. 19.  No hearing is necessary.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; *see also* 28 U.S.C. § 2254(e)(2).  For the following reasons, the Court will deny relief and dismiss the Petition with prejudice.

### Procedural History[1]

On January 9, 1995, Green was indicted in the Circuit Court for Baltimore County on two counts of first degree murder, two counts of kidnaping, two counts of armed robbery and one count of unlawful possession of a controlled dangerous substance.  Paper No. 9, Exhibit 1 at 1.  On February 13, 1995, he was indicted in the Circuit Court for Baltimore County  on two counts of use of a handgun in the commission of a crime of violence and wearing or carrying a handgun.[2]  *Id*., Exhibit 2 at 1.  The State had given notice of intention to seek the death penalty, prompting Green to seek removal to another county.  The cases were removed to the Circuit Court for Carroll County.  *Id*., Exhibit 1 at 1-9; Exhibit 2 at 1-9; Exhibit 3 at 1-4, and Exhibit 4 at 1-4.

---

[1]      The procedural history of the case was fully summarized in this Court's Memorandum of January 4, 2005.  It is repeated here to provide a full understanding of the case.

[2]      As noted by the Court of Special Appeals of Maryland, the grand jury handed down two indictments arising out of incidents occurring on December 15, 1994.

Following two days of hearings, *id.*, Exhibits 10 and 11, and seven days of trial, a jury convicted Green on two counts of first degree murder, one count of kidnaping and one count of use of a handgun in the commission of a crime of violence.[3]  *Id.*, Exhibits 12-18.  On June 14, 1996, Green was sentenced to twenty years imprisonment, five without parole for the handgun conviction; life imprisonment for one count of first degree murder, consecutive to the handgun sentence; life imprisonment without the possibility of parole for the other count of first degree murder, consecutive to both the life sentence and the twenty-year sentence; and eighteen months imprisonment for kidnaping, concurrent to the life sentence and consecutive to the twenty-year sentence.[4]  *Id.*, Exhibit 22 at 235-43.

---

[3]     The facts of the crime, as summarized by the Court of Special Appeals, follow:

Late on Thursday morning, December 15, 1994, Kurt Benkert (Benkert), Esteban Santana (Santana), and Santana's nine-month-old daughter, Sabrina, paid a visit to appellant's (Matthew Green's) home located in Arbutus, Maryland.  During the visit appellant shot Santana in the right temple and stabbed him in the neck.  He also shot Benkert twice and struck him once on the head.  Both Santana and Benkert died from their injuries.  After the killings, appellant placed Sabrina in a car seat in her father's pick-up truck and drove her to the Patapsco Valley Park located in Carroll County, Maryland.  He parked the pick-up, left Sabrina in the truck, and hitchhiked back to his home.  Appellant next dug a hole in the dirt portion of his basement and interred the bodies of Santana and Benkert.  He then cleaned up the areas in his home that had been bloodied, drove to the Patapsco River bridge, and discarded a knife used in the killings, as well as blood-spattered clothing and other incriminating materials.

A passerby discovered Sabrina, unharmed, shortly after appellant abandoned her.  Once the police were notified, they sought to determine the whereabouts of Santana and Benkert.  Police learned that appellant might have been one of the last persons to see the men alive, and at approximately 9:00 p.m. on the day following the killings, appellant was interviewed and arrested for possession of marijuana.

On Saturday, December 17, 1994, about 5:50 p.m., appellant gave a lengthy tape-recorded statement to the police in which he admitted killing Santana and Benkert.  According to appellant's statement, Santana and Benkert were drug dealers who had come to his home, uninvited, to collect a drug debt.  Appellant told police that the men struck him and threatened him with a knife and that he killed the two in self-defense.

Paper No. 9, Exhibit 26 at 1-2.

[4]     Green elected to forego a jury recommendation as to his sentence and was sentenced by the trial judge.

On appeal, Green argued that the trial court:

1.      Erred in denying his motion to suppress his statement to police;

2.      Abused its discretion in denying his second request for removal;

3.      Abused its discretion in denying his motion for mistrial;

4.      Erred in denying his motion for judgment of acquittal as to the kidnaping of Sabrina Santana;

5.      Erred in refusing his request for supplementation of its jury instructions regarding imperfect self-defense;

6.      Allowed improper argument during rebuttal, thus depriving him of a fair trial; and

7.      Erred in denying his motion for new trial as to the State's closing argument, the jury array, and a particular juror.

*Id.*, Exhibit 24.  On October 27, 1997, the Court of Special Appeals affirmed Green's convictions in an unreported opinion.[5]

Green sought *certiorari* review of five issues:

1.      Whether the trial court committed reversible error in denying his motion to suppress his statement;

2.      Whether the trial court committed reversible error in denying his second suggestion of removal from the Circuit Court for Carroll County;

3.      Whether the trial court erred in denying his motion for mistrial when prejudicial testimony was elicited;

4.      Whether the trial court abused its discretion in allowing a prosecutor to make an improper closing argument over objection; and

5.      Whether the trial court erred in denying his motion for new trial.

*Id.*, Exhibit 27 at 1-2.  On February 11, 1998, the Court of Appeals of Maryland denied review.  *Id.*,

---

[5]     The mandate issued on November 28, 1997.  *Id.*, Exhibit 26.

Exhibit 28; *see also Green v. State*, 348 Md. 523, 704 A.2d 1244 (1998).

On December 9, 1998, Green, through counsel, initiated post-conviction proceedings in the Circuit Court for Carroll County.  Green's claims, stated by the post-conviction court, included numerous instances when trial counsel allegedly was ineffective in failing to:

1. Call Green as a witness, when his testimony was required to establish that the killings were committed in self-defense; when Green had no impeachable offenses; and when Green's testimony during the suppression hearing and during allocution helped his case;

2. Adequately cross-examine the medical examiner and call as a witness an expert in scalp wounds who could explain that the 35 wounds could have been inflicted with five or fewer blows to the head using the side of a gun;

3. Call an expert witness to explain the "fight or flight" response experienced by a person who perceives his life is in danger, which would have explained how the decedents' wounds could have been consistent with self-defense;

4. Move for a new trial based on insufficiency of the evidence or based on the verdict being against the weight of the evidence, when the trial court essentially stated that Green was guilty only of manslaughter;

5. Object on numerous occasions;

6. Introduce evidence that one of the reasons Green buried the bodies in his basement rather than call the police was his fear of retaliation for killing two major drug dealers, such fear was reasonable and was realized when Green's wife was actually threatened after the incident;

7. Give an effective opening statement;

8. Effectively cross-examine Commissioner Ferguson;

9. Submit an effective appellate brief;

10. Call Green's civil attorneys, who would have testified that they represented him at the time of his arrest and, had they been contacted, would have advised him not to make any statement without an attorney present;

11. Present evidence that Estaban Santana had a reputation for violence because

he beat his wife, when such evidence was available, admissible and very important to Green's case;

12.     Object to the admission of a duplicate of the tapes of Green's statement to police;

13.     Present testimony from witnesses as to prior threats against Green from decedents;

14.     Impeach an important state's witness with evidence which would have demonstrated he lied in his earlier testimony;

15.     Demonstrate familiarity with cases he cited in his motion to remove; and

16.     Introduce the kitchen gate and the piece of wood from the basement door, and to have Kurt Benkert's hands tested for gun powder residue;

The next claim, Ground 17, alleged ineffective assistance of counsel in light of the cumulative effect of counsel's errors.  The post-conviction court also considered two allegations of trial court error: failing to suppress Green's statement to the police (Ground 18) and denying Green's second motion to remove from Carroll County when there was extensive pretrial publicity and where the victims lived, and had been kidnaped (Ground 19).  *Id.*, Exhibit 33 at 4-5; *see also* Exhibit 29 at 9, 32-33.  Following three days of hearings, the post- conviction court denied relief on June 15, 2000.  *Id.*  Green through counsel sought leave to appeal, citing the following grounds:

1.     The post-conviction court erred in finding that Green's attorney did not render ineffective assistance when he failed to call him as a witness, when the court found that Green waived his right to testify and that failing to call him to testify was sound trial strategy;

2.     The post-conviction court erred in finding that Green's attorney did not render ineffective assistance when he failed to introduce evidence from the State's own witness or another expert that Green did not strike one of the decedents 35 times in the head, and that the 35 individual wounds were inflicted with far fewer than 35 blows;

3.     The post-conviction court erred in finding that Green's attorney did not render ineffective assistance when he failed to call Dr. McDaniel as a

witness, when the post-conviction court erroneously held that trial
strategy is not cognizable in an ineffective assistance claim;

4.      The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance when counsel failed to move for a new trial
based on insufficiency of the evidence or based on the verdict being
against the weight of the evidence, when the trial court essentially stated
that Green was guilty only of manslaughter;

5.      The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to object in two instances;

6.      The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to introduce evidence that one of the
reasons Green buried the bodies in his basement rather than call the police
was his fear of retaliation for killing two major drug dealers, such fear
was reasonable and was realized when Green's family actually was threatened
after the incident;

7.      The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to give an effective opening statement;

8.       The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to submit an effective appellate brief;

9.      The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to call Green's civil attorneys, who
would have testified that they represented Green at the time of his arrest
and, had they been contacted by Green at the time of his arrest, they would
have advised him not to make any statement without an attorney being
present;

10.     The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to present evidence that Estaban
Santana had a reputation for violence;

11.     The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to object to the admission into evidence
of a duplicate of the tapes of Green's statement to the police;

12.     The post-conviction court erred in finding that Green's attorney did not
render ineffective assistance in failing to present testimony from witnesses
as to prior threats against Green from decedents;

13. The post-conviction court erred in finding that Green's attorney did not render ineffective assistance in failing to impeach an important State's witness with evidence which would have demonstrated he lied in earlier testimony;

14. The post-conviction court erred in finding that Green's attorney did not render ineffective assistance in failing to be familiar with cases he cited in his motion to remove;

15. The post-conviction court erred in finding that Green's attorney did not render ineffective assistance when he failed to introduce the piece of wood from, and photographs of, the broken basement door;

16. The post-conviction court erred in finding that Green's attorney did not render ineffective assistance in light of the cumulative effect of these errors;

17. The post-conviction court erred in finding that the issues concerning Green's statement to the police were fully and finally litigated below and therefore not entitled to post-conviction review; and

18. The post-conviction court erred in finding that the issues concerning the trial court's failure to grant Green's second motion to remove were fully and finally litigated below and therefore not entitled to post-conviction review.

*Id.*, Exhibit 34 at 14-16.  On October 31, 2000, Green filed a supplement to his application for leave to appeal with respect to: claims concerning photographs of the broken lock; the failure to call Dr. McDaniel as a defense witness; pathology regarding the number of blows; and the failure to present the original tapes of the confession.  *Id.*, Exhibit 35.

On May 24, 2001, the Court of Special Appeals granted the application and ordered the parties to brief "whether trial counsel rendered ineffective assistance of counsel by failing to call [Green] as a witness and by failing to present additional self-defense evidence."  *Id.*, Exhibit 36. Petitioner's brief raised the following issues:

1. Whether trial counsel rendered ineffective assistance in failing to call Green as a witness to establish self-defense;

2.      Whether trial counsel rendered ineffective assistance in failing to
        introduce photographs and other evidence showing the broken basement
        door, lock and frame;

3.      Whether trial counsel rendered ineffective assistance in failing to call
        Dr. McDaniel as a witness to establish self-defense;

4.      Whether trial counsel rendered ineffective assistance in failing to
        effectively cross-examine Dr. Dixon and introduce exculpatory pathology
        evidence; and

5.      Whether trial counsel rendered ineffective assistance based upon the
        cumulative effect of these errors.

*Id.*, Exhibit 37.  Relief was denied in an unreported opinion filed on August 7, 2002.  The mandate

issued on September 6, 2002.  *Id.*, Exhibit 38.

Green sought *certiorari* review on September 19, 2002, on the grounds that:

1.      The Court of Special Appeals erred in ruling that trial counsel was not
        ineffective in failing to: introduce evidence of self-defense in connection
        with evidence of the broken basement door; introduceexculpatory pathology
        evidence; call Dr. McDaniel as a witness; call Green as a witness; and
        consider the effect of cumulative errors on the jury; and

2.      The post-conviction court erred in ruling that Green's trial counsel was not
        ineffective as alleged in the post conviction petition.

*Id.*, Exhibit 40 at 2-3.  On December 12, 2002, the Court of Appeals denied review.  *Id.*, Exhibit

41; *see also Green v. State*, 372 Md. 133, 812 A.2d 289 (2002).

Green now raises the following claims in his federal habeas corpus petition:

(1)     He was denied effective assistance of trial counsel when counsel failed to:

        (a)     call him as a witness, when his testimony was required to establish
                that the killings were in self-defense, when he had no impeachable offenses,
                and when his testimony during the suppression hearing and during allocution
                was helpful to the case;

        (b)     adequately cross-examine the medical examiner and to call as a witness
                an expert in scalp wounds who could explain that the 35 wounds could have

been inflicted with five or fewer blows to the head by the side of the gun;

(c)    call an expert witness to explain the 'fight or flight' response experienced by a person who perceives his life is in danger, which would have explained how the decedents' wounds could have been consistent with self-defense;

(d)    move for a new trial based on insufficiency of the evidence or based on the verdict being against the weight of the evidence when the trial court virtually found Green was guilty only of manslaughter;

(e)    object in numerous instances;

(f)    introduce evidence that one of the reasons Green buried the bodies in his basement rather than call the police was his fear of retaliation for killing two major drug dealers, which fear was reasonable and was realized when Green's wife actually was threatened after the incident;

(g)    give an effective opening statement;

(h)    submit an effective appellate brief;

(i)    call Green's civil attorneys, who would have testified that they represented Green at the time of his arrest and, had they been contacted, they would have advised him not to make any statement without an attorney being present;

(j)    present evidence that Estaban Santana had a reputation for violence because he beat his wife, where such evidence was available and admissible and very important to Green's case;

(k)    object to the admission into evidence of a duplicate of the tapes of Green's statement to police;

(l)    present testimony from witnesses as to prior threats against Green from decedents;

(m)    impeach an important State's witness with evidence which would have demonstrated he lied in his earlier testimony;

(n)    be familiar with cases he cited in his motion to remove; and

(o)    introduce the kitchen gate and the piece of wood from the basement door, and have Kurt Benkert's body tested for gun powder residue.

Green also alleges counsel was ineffective in light of the cumulative effect of the errors

alleged above (Ground p).

Additionally, Green alleges that

(2)      the trial court erred in:

      (a)  failing to suppress Green's statement to the police; and

      (b)  denying Green's second motion to remove, where there was extensive
           pretrial publicity, where the victims lived in Carroll County, and
           where the alleged kidnaping occurred in Carroll County.

*See* Paper No. 1 at 20-21.

## Threshold Considerations

### Timeliness

The Court has determined that the Petition is timely, Green has exhausted all state court remedies, and  with the exception of two sub-parts listed in Ground (1)(o), [6] none of the grounds for relief is barred from review by the procedural default doctrine.

## Analysis of Petitioner's Claims

This   petition is subject to, 28 U.S.C. § 2254, as amended, which provides a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997).  A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

---

[6]      In Ground (1)(o), Green claims that counsel failed to introduce the kitchen gate and the piece of wood from the basement door, and failed to inquire whether Kurt Benkert's body had been tested for gun powder residue.  Counsel for Green has withdrawn part of this contention; he argues only that counsel failed to introduce the piece of wood from the basement door.  Paper No. 13.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court held that a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 412-413.   A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410. Furthermore, when a state court has made a finding of fact, it is presumed to be correct and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).   Using this framework, the Court examined Green's claims of ineffective assistance of counsel and trial court error.

### Ineffective Assistance of Counsel

To establish a claim of ineffective assistance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).   With regard to the first prong of this test, the district court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.   All circumstances are to be considered, and the court's scrutiny of counsel's conduct must be "highly

deferential." *Id.* at 688-89.   Even if it is determined that counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).   A federal writ can be granted only if a state court decision "was contrary to, or involved an unreasonable application of, clearly established" precedents of the Supreme Court. 28 U.S.C. § 2254(d)(1). This "unreasonable application" prong permits the writ to be granted when a state court identifies the correct governing legal principle but unreasonably applies it to the facts of a petitioner's case.[7] *See Williams v. Taylor*, 529 U.S. at 413.   For this standard to be satisfied, the state court decision must have been "objectively unreasonable," *id.* at 409, not just incorrect or erroneous.

(a)     Failure to Call Green to Establish Self-Defense

Maryland recognizes two varieties of self-defense: "perfect" or "complete" self-defense, and "imperfect" or "partial" self-defense.   Perfect self-defense is a complete defense to a charge of criminal homicide, constitutes a justification for the killing, and, if credited by the trier of fact, results in an acquittal.   *See State v. Marr*, 362 Md. 467, 472, 765 A.2d 645, 647 (Md. 2001).   The elements of perfect self-defense are:

(1)     The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2)     The accused must have in fact believed himself in this danger;

(3)     The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

----

[7]     "Reasonableness" is defined in terms of prevailing professional norms.   *See Williams v. Taylor*, 529 U.S. at 688.

> (4)     The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*See State v. Faulkner*, 301 Md. 482, 500, 483 A.2d 759, 768-69 (Md. 1984); *Dykes v. State*, 319 Md. 206, 211, 571 A.2d 1251, 1254 (Md. 1990); *Marr*, 362 Md. at 473, 765 A.2d at 648.

The prospect of imperfect self-defense arises when "the actual, subjective belief on the part of the accused that he or she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of deadly force, is not an objectively reasonable belief."  What is unreasonable "is the perception of imminent danger or the belief that the force employed is necessary to meet the danger, or both."  *Marr*, 362 Md. at 473, 765 A.2d at 648.  Unlike "perfect" or "complete" self-defense, imperfect self-defense is neither  a justification for the killing nor warrants an acquittal: it negates the element of malice required for a conviction of murder and reduces the offense to manslaughter.  Thus, one with an honest subjective apprehension of imminent danger of death or serious bodily harm who believed that the force used was necessary to meet the danger cannot be found to have acted out of malice.  As stated in *Burch v. State*, 346 Md. 253, 283, 696 A.2d 443, 458, *cert. denied*, 522 U.S. 1001 (1997) and again in *Marr*, 362 Md. at 474, 765 A.2d at 648:

> [T]he only substantive difference between the two doctrines, other than their consequences, is that, in perfect self-defense, the defendant's belief that he was in immediate danger of death [or] serious bodily harm or that the force he used was necessary must be objectively reasonable.  In all other aspects, the elements of the two doctrines are the same."

At trial the State introduced Green's statement to the police.  In that statement Green clearly attempted, albeit in a somewhat disjointed fashion, to establish that he was not the aggressor and that as the incident escalated he first pulled a gun and unsuccessfully ordered Santana and Benkert to

-13-

leave.[8]  The gun was taken from him and Santana and Benkert continued to punch him, prompting

him to escape his assailants by fleeing to his basement and attempting to call the police.  "They"

unplugged the phone before continuing to hold and punch Green.  When Santana approached him

with a "little steak knife" Green, who had regained possession of the gun, began to fire, striking both

men before again losing control of the gun.  Green managed to grab the knife and stab Santana

before stabbing Benkert and retaking and firing the gun.  Green then beat Benkert's with the gun.

The lengthy transcript of the statement further reveals that Green drove Santana's child to a nearby

state park and abandoned her in Santana's truck before hitchhiking home where he cleaned the

premises, disposed of bloody evidence by dumping it in the Patapsco River, buried the bodies in his

basement, repainted the basement floor and ceiling, and attempted to repair dry wall that "was

busted out...where [he] got through the wall."  Paper No. 9, Exhibit 22.

Green, who had no impeachable offenses, proved to be articulate when testifying at pre-trial

motions hearings and during sentencing.  At post-conviction, Green's legal expert testified that when

a defendant had no prior impeachable record and there were no eyewitnesses to establish self-

defense, failure to call the defendant as a witness constitutes ineffective assistance.  (*Id.*, Exhibit 31

at 150).  Additionally, Green testified at post-conviction that trial counsel made no attempt to

prepare him for trial, thus leaving him unprepared for the rigors of providing direct testimony and

undergoing cross-examination.  *Id.*, Exhibit 32 at 55.

---

[8]        Green admits calling Santana using a pay phone and telling him it would take a day or two to
come up with the $220 Green owed for drugs.  Santana knocked on Green's door later that morning and began
arguing about the money before striking Green in the throat, prompting Green to step over a child safety gate into
the kitchen and pull a .38 revolver out of a drawer while ordering Santana to leave.  Benkert then entered the house
holding Santana's nine-month-old daughter, Samantha, whom he placed in a playpen before "com[ing] up like he
was go[nna] back [Santana] up."  Green, who routinely kept the first round in his gun empty, pulled the trigger,
prompting Santana to grab the gun.  Benkert then held Green from behind while Santana "started beat'n the shit out
of [him] again" by hitting Green in the stomach.  Paper No. 9, Exhibit 22.

Trial counsel, on the other hand, testified that while he did not do a "mock trial" to evaluate his client's ability to testify at trial, he did speak extensively to him about what to expect during cross-examination.  *Id*., Exhibit 31 at 29-30.  Counsel also testified that he "thought that we had a defense and I believe the defense, in my opinion, would get no better [than the confession statement] by Matt Green testifying to essentially what he said in that statement and at the same time exposing himself to possible questions on the part of prepared prosecutors that may, in all likelihood, diminish the defense."  *Id*., Exhibit 31 at 28.  Counsel also testified that his years of trial experience have led him to conclude that "cases are more often lost by a defendant's testimony than his silence" *id*, Exhibit 31 at 27, and that Green did not leave "a good impression" on the trial judge at the pretrial suppression hearing.  *Id,* Exhibit 30 at 189.

The ability to articulate while on the stand at the pretrial and sentencing hearings, standing alone, does not mean that Green would have been an effective witness at trial before a jury when subjected to cross-examination.  The post-conviction court found that counsel's decision was reasonable and based on sound trial strategy.  After review of the record, the Court concurs.  The confession, introduced by the State,  provided Green's version of the incident.  The confession also drew into question why Green called Santana from a pay phone the morning of the incident, and why Green did not sustain significant injury other than one faint bruise.  It also permitted an inference that the fight –which at first involved only Santana -- did not progress beyond one or two blows until Green entered the kitchen and pulled out his gun.  Facts that Green presumably would have brought forth had he testified (that  a telephone was unplugged or ripped from its outlet, dry wall damaged, and a door jamb destroyed), although relevant to the intensity of the battle that ultimately ensued between the three men, do not rebut that: Green  used a public telephone to call Santana the day of

the killings, admitted him to his home, escalated a fist fight by pulling a gun on his assailant, brutally killed two men while sustaining only one faint bruise, then dispatched evidence of the killings by taking one victim's truck and child to a remote location before returning home to repair evidence of the fight and bury the dead.  Counsel's strategy to keep Green from taking the stand prevented the State from focusing on key discrepancies in Green's confession, and withstands scrutiny under *Strickland* and its progeny.

        (b)       Failure Adequately to Cross-Examine the Medical Examiner and Call a Defense Expert

Green next argues that counsel failed adequately to cross-examine Dr. Ann M. Dixon, the State's deputy chief medical examiner, and to call an expert in scalp injuries.  He notes that trial counsel consulted a forensic pathologist but never called him to testify and during consultation failed to ask him  – whether the lacerations could have been inflicted by as few as five blows.[9]  At trial, Dr. Dixon testified that the thirty-five lacerations caused comminuted fractures to the skull, shattering it "like an egg shell."  *Id.*, Exhibit  No. 15 at 184.  She further testified that the gunshots and stab wounds were inflicted prior to the blunt force trauma to the skull.  *Id.*, Exhibit 15 at 185-187.

Before trial, counsel consulted with Dr. Bert Morton, a former deputy medical examiner in Maryland, who is board certified in forensic pathology.  *Id.*, Exhibit 31 at 129.  At post-conviction, Dr. Morton testified that he was not asked to appear at trial, was never asked to evaluate the type of weapon that might have caused the multiple lacerations and comminuted compound skull fractures, and was not asked to approximate the number of blows required to produce the lacerations.

---

[9]     Green contends that these alleged deficiencies bolstered the State's closing argument that the killings were not in self-defense as evidenced by "bludgeoning" caused by thirty-five separate blows to Benkert's head.  *Id.*, Exhibit 17 at 61.

On post-conviction he agreed that one blow to the head with a weapon could produce multiple lacerations. *Id*., Exhibit 31 at 136-37.

At post-conviction, trial counsel indicated that Dr. Morton and State's witness Dr. Ann Dixon were asked about the number of scalp wounds prior to trial, and both agreed that the lacerations could be produced without separate blows. *Id*., Exhibit 30 at 98. Despite the benefit of such information, counsel's cross-examination of Dr. Dixon concerning Benkert's injuries consisted *in toto* of the following:

> Ms. DeCoursey: Dr. Dixon, I have a question about Mr. Santana, the first autopsy that you performed or that you described anyway: You used the phrase eccentric?
>
> Dr. Dixon: Yes.
>
> Ms. DeCoursey: When you were discussing the gunshot wound to Mr. Santana's region of his back.
>
> Dr. Dixon: Yes.
>
> Ms. DeCoursey: Eccentric you said gave an indication of a direction of the bullet, the wound path of the bullet?
>
> Dr. Dixon:  It is more of an indication as to the angle at which it struck the skin.
>
> Ms. DeCoursey: The angle of entry?
>
> Dr. Dixon: Yes.
>
> Ms. DeCoursey: You said that concentric is the opposite of eccentric?
>
> Dr. Dixon: Well, I'm not sure.
>
> Ms. DeCoursey: Or is it an opposeable term, it is different than eccentric?
>
> Dr. Dixon: Yes.
>
> Ms. DeCoursey: And eccentric indicates an obtuse angle, in this situation

with Mr. Santana?

Dr. Dixon: It is a measure of how you are measuring the angle.  I'm sorry.
It indicates that the shot is striking tangentially.

Ms. DeCoursey: As opposed to perpendicular?

Dr. Dixon: Yes.

Ms. DeCoursey: So, it is not perpendicular?

Dr. Dixon: Correct.

Ms. DeCoursey: And depending upon where I put my protractor, it could would
be acute or obtuse.

Dr. Dixon: Exactly.

Ms. DeCoursey: As to Mr. Benkert, the word eccentric is also used for the gunshot
wound under his nose.  Again, it indicates or gives an indication of the direction
being or it gives an indication that the angle of entry again was not direct, was not
perpendicular?

Dr. Dixon: Correct.

Ms. DeCoursey: It was, in fact, acute or obtuse depending upon where you
put your protractor?

Dr. Dixon: Exactly.

               *   *   * *

Ms DeCoursey: Also Dr. Dixon, as to Mr. Benkert['s muscle development]?

Dr. Dixon: Yes.

Ms. DeCoursey: Did you make any comment in the opening of that report as to
the general well-being?

Dr. Dixon: Yes.He also was well developed and well nourished.

Ms. DeCoursey: On page six of that report?

Dr. Dixon: Musculoskeletal system was within normal.

-18-

Ms. DeCoursey: Free of all abnormalities or weaknesses?

Dr. Dixon: There were no abnormalities.

Redirect Examination:

Mr. Gunning: What was Mr. Benkert's Size, height and weight?

Ms. DeCoursey: Objection.

The Court: Overruled.

Dr. Dixon: Mr. Benkert was five foot ten and 140 pounds.

*Id*., Exhibit 15 at 199-201.

Dr. Robert H. Kirschner, a forensic pathologist and former deputy chief medical examiner in Illinois who had done extensive work in the field of blunt and forced traumas to the head, testified at post-conviction that "when one strikes the scalp with a blunt object, particularly an object like a...pistol...[a] single blow can cause three lacerations." Dr. Kirschner, testifying on Green's behalf, indicated that "[m]arks can be made by, for example, a barrel frame and trigger guard." *Id*., Exhibit 30 at 52, 56 and 64. Dr. Kirschner, however, did not testify that autopsy and other evidence supported Green's contention that he struck Benkert with the side of his gun five times; instead, his testimony supports a conclusion that twelve to fifteen blows caused the thirty-five lacerations noted by Dr. Dixon. *Id*., Exhibit 30 at 67-68. Indeed, Green himself admitted to hitting Benkert "twelve times tops." *Id*., Exhibit 32 at 47.

Green's post-conviction legal expert testified that the cross-examination of Dr. Dixon was deficient because it omitted Dr. Dixon's pre-trial concession "that the thirty-five scalp lacerations could have been caused by far fewer than thirty-five blows, which takes some of the sting out of...the State's theory] that tremendously excessive force was used." *Id*., Exhibit 31 at 158. The post-

conviction court disagreed, finding that the failure to question Dr. Dixon concerning fewer blows than the number of lacerations was a matter of trial tactics and was not prejudicial, given that Benkert was shot twice and stabbed three times in the neck.  The court noted that:

> Kurt Benkert's 35 scalp wounds may have been caused by fewer
> than 35 blows clearly does not have the mitigating effect that Petitioner
> would have this Court believe it does.

*Id.*, Exhibit 33 at 12-13.

This court finds sufficient testimony in the post-conviction record to support Green's contention that trial testimony could have been elicited  – either from an expert such as Dr. Morton or Dr. Kirschner or from the State's expert, Dr. Dixon – in an attempt to persuade jurors that Benkert's scalp injuries were produced with fewer than thirty-five blows.  The Court also finds that Green's post-conviction expert, Dr. Morton, testified that the injuries likely were the result of a dozen or more blows to the head and not, as Green suggests here,   merely  five blows.  Whether caused by thirty-five blows or a dozen blows, the scalp injuries produced horrific damage and were the primary cause of Benkert's death.  There is little probability that the outcome of the trial would have been different had such evidence been before the jury, because the degree of force used was not borne out by evidence of extensive injury to Green sufficient to establish that Green acted in self-defense.  The state post-conviction court's decision did not involve an unreasonable application of federal law nor an unreasonable determination of the facts and is not a basis for federal habeas corpus relief.

(c)     Failure to Call an Expert on the "Flight or Fight" Response

Dr. Ellen McDaniel, a forensic psychiatrist, was retained by the defense to testify during the

guilt/innocence phase of trial and, if necessary, to provide additional testimony at sentencing.[10] Paper No. 9, Exhibit 32 at 10, 14-15.  Her psychological profile of Green found him to be intelligent, articulate and able to sustain a full range of emotion.  Although a substance abuser, Green did not exhibit anti-social behavior "as a way of life."  *Id.*, Exhibit 32 at 25-26.  Dr. McDaniel found Green's description of the incident consistent with a "fight or flight" response, which she described as a "very old reflex mechanism...originally...evolved to promote survival."  Noting that this "reflex" mechanism is present in everyone, Dr. McDaniel described it as when "the body goes into supercharge to either get ready for battle or to escape...a real threat."  She further noted that "It might be an overreaction to the threat, but the threat is an obvious one," and that the response is automatic, not premeditated.  *Id.*, Exhibit 32 at 26, 28.  The doctor was prepared to testify at trial that to a reasonable degree of psychiatric certainty, Green's psychological profile was consistent with a subjective belief that deadly force was necessary under the circumstances, and that the automatic "fight or flight" response took over, resulting in the killing of his assailants.[11]  She also was prepared to testify that his profile showed him to have non-violent tendencies.  *Id.*, Exhibit 32 at 28-29, 34.  On the eve of her testimony, Dr. McDaniel received notice from defense counsel that her testimony would not be required in the guilt/innocence phase.

At post-conviction, Green attempted to present Dr. McDaniel as an essential defense witness and contended counsel improperly excluded her testimony based upon (1) an erroneous belief that

---

[10]     Counsel originally retained Dr. McDaniel "just to be certain that there were no issues that could or should be raised concerning any disorder that [Green] may have suffered from at or near the time of these events." When McDaniel could not find any disorder to "rise to the level of a [not criminally responsible] plea...the defense "got to the flight or fight issue."  *Id.*, Exhibit 31 at 50.

[11]     Dr. McDaniel also was prepared to explain why Green buried the bodies in the basement by testifying that Green's profile suggested he could not "think through all the possibilities and permutations and then come up with a...best answer" because of  rigidity in focus and thought.  *Id.*, Exhibit 32 at 29-30.

Maryland law precluded an expert from giving opinion testimony based upon statements of a defendant when the defendant does not testify, and (2) an improper assessment that the Doctor's testimony in prior criminal cases might be used to impeach her credibility.  These contentions do not

hold up under close examination.  Under Maryland law, a trial court is given broad discretion in ruling on the admissibility of expert testimony, and the court's decision in admitting or excluding such testimony seldom is reversed.[12]  In regard to the impeachment concern, on at least one occasion the Court of Appeals of Maryland upheld a trial court's determination that Dr. McDaniel's psychological profile testimony was inadmissible because the proffered facts were not relevant to the issue upon which they were offered, when such testimony amounted to a defendant's "attempt to create an entire scenario of what took place at the time of the murder by evidence not admissible for any reason other than to explain an opinion based upon that scenario."[13]  *See Hartless v. State*, 327 Md. 558, 580-81, 611 A.2d 581, 592 (1992).

Counsel initially believed the "fight or flight" testimony might benefit the defense by explaining the extreme flow of adrenalin that could result in the affliction of wounds.  *Id.*, Exhibit 31 at 52.  On the eve of Dr. McDaniel's testimony a member of the trial team met with Green,

---

[12]     *See Johnson v. State*, 303 Md. 487, 616, 495 A.2d 1 (1985); *Stebbing v. State*, 299 Md. 331, 350, 473 A.2d 903 (1984).

[13]     Hartless killed a convenience store clerk during a robbery and attempted to use testimony from Dr. McDaniel's report to show that he was under stress from his father which caused him to panic and kill his victim to stop her screaming and allow him to escape.  Specifically, Dr. McDaniel's report concluded that Hartless had "no thought, plan or intention to murder the victim." *Hartless*, 327 Md. at 572-73, 611 A.2d at 588.  Like Green, Hartless elected not to testify at trial.  Unlike Green, Hartless's exculpatory statement to police was not admitted into evidence at trial; thus, it was impossible for the defense to develop Hartless's version of what happened, which was needed not only to form the basis of the doctor's expert opinion, but also to define her opinion's relevance in that case.  The appellate court found no abuse of discretion resulting from the trial court's exclusion of the evidence on that basis and further noted that the trial court properly excluded the psychological profile testimony because the profile could not be relevant to the question of Hartless's intent to kill.  *Hartless*, 327 Md. at 580-81, 611 A.2d at 591-92.

advising him not to allow her to be called as a witness, and to sign a "waiver" agreeing to same.  *Id.*,

Exhibit 30 at 128 and Exhibit 29, attachment 6.  This attorney testified at post-conviction that Dr.

McDaniel was not called as a witness because she kept "backing away" from her opinions, *id.*,

Exhibit 30 at 115, and because the State would attempt to destroy her credibility by referring to

testimony she had given in other cases.[14]  At the post-conviction hearing, counsel recalled that the

defense had talked to other psychiatrists but felt that Dr. McDaniel was the best choice because she

had the most work in the area involving rage and drug intoxication.   Trial counsel noted Dr.

McDaniel was a very good witness at sentencing, and further stated that:

> ...she didn't talk about a diagnosis at all.  She talked about the stressors
> and that was her strength throughout the entire time that we spoke with her
> ...she was very, very attuned to the stressors on Matt for Matt's family,
> with his wife and children, with his mother, with the history of alcoholism,
> the history of depression, the history of substance dependence.  She was very,
> very strong in what I'd call mitigators.  She was not very good about – or
> not – not good but not strong on whether or not there was a – a body of
> accepted scientific through around the areas of autonomic response, fight
> and flight and rage....It – it was like she had these little factors, but she
> couldn't make them into a cohesive [w]hole...and – so, we, several times,
> would go over and over – we would start at a point where she would say,
> "I don't think we...I – I have an opinion to help you in a defense," and I
> would say, "What about autonomic response, fight and flight and rage,"
> and we would get to a point where we thought we could put something together
> ...and over and over again there was this dynamic of having to start where we
> started before and we would come to a point of agreement and then the next
> time I talked to her, we would be back...in a different position.

> * * * *

> [State's Attorney] Tim Gunning made me aware of a file that the State's

_____

[14]      Dr. McDaniels, a paid expert witness who frequently appeared on behalf of defendants, was
perceived by local death penalty attorneys to be opposed to capital punishment in all circumstances.  *Id.*, Exhibit 31
at 65.  On the eve of her testimony a member of the defense team was given copies of McDaniels's testimony in
other cases by the prosecutor. *Id.*, Exhibit 30 at 120. Counsel was concerned that McDaniel's previous testimony
might be used to impeach her, but counsel did not file a motion in limine to determine whether such testimony
might be admissible in cross-examination.  *Id.*, Exhibit 30 at 121-124.

> Attorney's Office for Baltimore County had on a number of different psychiatrists who give expert opinions in defense – for defense lawyers and that they had a file on Doctor McDaniel and within it was a case where she had testified that the size of a man's penis had affected his conduct and that – I questioned her about this case....She confirmed what I had been told by Mr. Gunning and she was very upset that this could come up in cross-examination.  I explained to her that it could, that that was an area that might be admitted as impeachment.

*Id.*, Exhibit 31 at 118-122.  Counsel also indicated that steps to keep impeachment evidence out might have been taken, had the defense "felt more confident in her strength of her own opinion, which was not very strong."  *Id.*, Exhibit 31 at 123-124.  Lead counsel noted that the jury was from Carroll County,[15] that Dr. McDaniel's testimony held less significance because Green would not be testifying, and that her testimony would not pass the "sniff test."  *Id.*, Exhibit 32 at 53-55, 69, 7).

The post-conviction court dismissed this claim as a matter of trial strategy not cognizable on collateral review.  Although this determination is clearly erroneous in that strategy may be considered, the record reflects that counsel  acted reasonably and within the range of required competence in declining to call Dr. McDaniel to testify at the guilt/innocence stage of trial.  Green has failed to meet either prong of the *Strickland* test.

(d)     Failure to Move for a New Trial

Green argues that counsel should have moved for a new trial based on insufficiency of the evidence.  Alternatively he contends that counsel should have argued that a new trial was warranted because the verdict was not based on the weight of the evidence.  In support of these contentions,

---

[15]     Counsel apparently thought that jurors from this once–rural area would understand "a situation where [Green] had to defend himself, that he had one of two choices, either to fight or to flee," thus making Dr. McDaniel's testimony "almost a so-what issue...what else is there to do, you either fight or you run...."  (*Id.*, Exhibit 32 at 53-54).  Counsel also felt such a jury would find such evidence "sill[y]".  *Id.*, Exhibit 31 at 70.

he alleges that the trial court virtually found him guilty only of manslaughter.  The undersigned, however, agrees with the post conviction court, which found no deficiency on the part of counsel:

> As to the first part, defense counsel made substantial argument for judgment of acquittal.  (Petitioner's Ex. 2 – T.T. April 24, 1996 13/19 p.p. 51-70).  Regarding the second part, the Court does not agree with Petitioner's contention that the "trial court essentially stated that Petitioner was guilty only of manslaughter."  The relevant portion of the transcript follows:
>
> > I am not persuaded that Mr. Green called [the decedents] to get a ruse to bring them over to his house for the purpose of murdering them.
> >
> > * * * * *
> >
> > I am persuaded that there was some provocation, because I am persuaded the Mr. Santana along with Mr. Benkert being there did press the Defendant for money and pressed him in a threatening fashion.  However, I am not persuaded that that threat was a substantial threat that in any way would explain the violent response which was out of all proportion to the victims' pressing and/or threatening of the Defendant for the purpose of obtaining their money.  (Petitioner's Ex. 2–S4-237, 238).

The trial judge's words have been misconstrued.  They do not indicate disagreement with the jury's verdict.  Trial counsel had no obligation – based on the evidence or based on the trial judge's statement – to move for a new trial.  The state court's determination is fully supported by the record, and is not an unreasonable application of clearly established Supreme Court precedent.  This claim provides no basis for relief.

(e)     Failure to Make Objections

Green points to five instances when trial counsel failed to object to allegedly key statements made by prosecution witnesses.  He first contends that trial counsel failed to object when Estaban Santana's wife testified that her husband was happy when he got off the telephone with Green.  Green contends that this testimony implied that Green told Santana to come over for his money, and

that such testimony concerning the decedent's state of mind was irrelevant and inadmissible. Because the jury heard this statement, it could conclude that Green invited Santana to his home intending to kill him.

Next, Green claims that counsel should have objected to testimony that Santana told his wife to go to Green's home to collect the debt, because such testimony was hearsay which prejudiced Green by buttressing the State's theory that Green was trying to lure Santana to his home with a promise to repay the debt. Green further contends that counsel failed to object when Enid Santana Bendt opined that Green was lying when he told her he did know Santana's whereabouts, because such testimony impugned Green's veracity.

Also at issue is counsel's failure to object to testimony that a commissioner made a determination of probable cause to hold Green without bond on charges of first degree murder. Green contends that the jury may have concluded that he was a dangerous criminal who could not be released pending trial and that a judicial officer already had determined his guilt.

Finally, Green also contends that trial counsel should have objected when photos depicting the exhumation of the bodies – which counsel sought unsuccessfully to exclude during a pretrial hearing – were offered and admitted at trial. Because the State sought to admit the photos to show the care with which exhumation took place, he argues that counsel should have stipulated that the exhumation caused no injury to the bodies, rather than risk prejudice that ensued after the pictures were shown to the jury.

As mentioned at the post-conviction hearing, these five failures to object occurred over more than one week of trial. Paper No. 9, Exhibit 31 at 92. Leaving aside whether trial counsel did in fact object to at least one comment, that Green was held without bond, *id.*, Exhibit 31 at 172, the post-

conviction court credited trial counsel's testimony that he ordinarily does not object to every objectionable statement, instead choosing to "pick [his] battles," and found that (i) such a decision represents sound trial strategy and (ii) Green failed to show that these failures to object prejudiced the outcome of his case.[16]   According to *Strickland*, there is a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and courts must be highly deferential in scrutinizing counsel's performance.  *Strickland*, 466 U.S. at 688-89.  Petitioner has not surmounted the presumption that "the challenged action might be considered sound trial strategy."  *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).  The undersigned concurs with the state's court's assessment.  Green is not entitled to relief on this ground.

(f)      Failure to Introduce Evidence of Fear of Retaliation for Killing Drug Dealers

At sentencing, Green stated during allocution that one reason he buried the bodies in the basement rather than call the police was his fear of retaliation for killing Santana, a known drug dealer.  Green specifically mentioned the possibility of a drive-by shooting at his home that might endanger his family.  This testimony differed greatly from his confession, in which he indicated that he "panicked pretty much" and didn't know if I should call the police and tell the police what's go[i]n' on, I said they're not go[i]n' to understand it," and but for Santana's "push[i]n' [the] situation," be and the victims would "still be friends today."[17]  Paper No. 9, Supplemental Exhibit

---

[16]      Indeed, inasmuch as Santana and Benkert were buried in the basement at the time Santana's sister, Enid Bendt. visited to Green's home, the jury could conclude on its own that Green lied to Bendt when he stated he had no knowledge of their whereabouts.

[17]      The confession further highlights the possibility that Green's claim of "fear" was concocted. When asked whether he'd ever been in a fight with the victims before, Green said:

No and okay I'll tell you a story about Steve that's why this I couldn't picture this thing [the fight and ensuing killings].  You can go back and you can get witnesses on this too. Last year my house burned out and I was selling pot for [Santana] at the time okay, I had, I was one that I didn't like leaving money in the house when I went out but I'd leave my

42 at 8, 44, 48.

As noted by the post-conviction court, Green's state of mind at the time he buried the bodies in his basement would have come before the jury through his testimony.  Had Green testified, the prosecution would have had ample opportunity to imply that Green's claim of fear of retaliation was not genuine, given his failure to raise it with detectives at the time of confession.  As previously noted, trial counsel's strategic decision to keep Green from the stand withstands scrutiny under *Strickland*.  There is no cause to disturb the state court's decision on the basis of this claim.

(g)    Failure to Give an Effective Opening Statement

Green complains that trial counsel failed in his opening statement to present greater detail concerning the elements of self-defense and the specific facts he intended to establish at trial.  The post-conviction court found that during his opening statement trial counsel indicating the killings were in self-defense.[18]  This finding is supported by the record.  Indeed, the record reveals that counsel mentioned that: Santana and his wife had attempted to collect the drug debt from Green the

---

pot there.  Well the post in the house caught fire.  The pot burned up....Well I gave [Santana] a thousand dollars I owed him two grand at the time.  I...said, when I get my thousand bucks, you know, I'll come see you....Well he turned around and put out a so-called little hit on me, that if I didn't come up with his money and...you can talk to Vincent Krug, cause [Santana] went and called Vince, my girlfriend's brother, and told him that I better...come up with the money...that him and Kurt were stalk[i]n' my girlfriend....Soon as I got my settlement check, he was the first person I took care of.... I didn't have noth[i]n' to do with him really for a little while after that, cause I paid him off and I didn't like the threats and all, by him...and he just started...frequenting me again and coming around, "Come on man, can you get rid of someth[i]n' for me, come on."

*Id*., Supplemental Exhibit 42 at 76-77.  Green later confessed that he was afraid of where his girlfriend and kids would go and what they would do, because "everybody's going to know about it...{w]here's that leave them...going to go into a store or someth[i]n', you know."  *Id*. at 96.

[18]    The bulk of counsel's opening statement focused on the fact that the death penalty was sought because of a statutory mitigator (two deaths), and the fact that such penalty was sought should not sway the jury into automatically assuming Green's guilt.  *Id*., Exhibit 12 at 65-67.  Counsel also sought to modify the impact from any photographs that might be introduced by the State.  *Id*. at 67.

days before the incident; Santana and Benkert visited Green intending to collect a drug debt; and their illegal trade and manner of enforcing collection of drug debts led to their demise. *Id*., Exhibit 12 at 71-82. Further, the State fully spelled out the elements of self-defense in its opening statement, making reiteration of the elements unnecessary. *Id*., Exhibit 12 at 52-53. The alleged deficiencies in the opening statement provide no basis for habeas corpus relief.

(h)     Failure to Submit an Effective Appellate Brief

Green's argument in support of this contention turns on appellate counsel's briefing of the issue involving the voluntariness of the confession. Appellate counsel noted that the district court commissioner told Green that he faced the death penalty and that this information was conveyed shortly before Green indicated he would give his statement despite the absence of an attorney. In its 2-1 decision the Court of Special Appeals stated that Green had failed to "put forth any argument as to how this fact made his subsequent statement involuntary." *Id*., Exhibit 26, Slip Opinion at 13. Counsel also argued that Trooper Deal's conduct made the statement involuntary. The appellate court stated that Green did "not point to any action or inaction on Trooper Deal's part that he claims made his statement involuntary. Given this oversight, it is difficult to grapple with this argument." *Id*., Slip Opinion at 13. Furthermore, the appellate court indicated that counsel failed to give "even a hint as to what weight" the officers' conduct in giving Green his Statement of Charges should be given. *Id*., Slip Opinion at 14.

The post-conviction court noted that:

> Petitioner's own expert witness, Mr. Fred Bennett, Esq., testified that taken *in toto*, the appellate brief was not deficient (despite the fact that he believed some individual issues, e.g. the voluntariness of Petitioner's statement to police, were deficiently briefed).

> Mr. Bennett further testified that he had no opinion as to the prejudice

-29-

prong of the *Strickland* test.  Even if this Court were to accept Mr.
Bennett's opinion that certain portions of the appellate brief were
deficient, which it does not, Petitioner has not shown that he was
prejudiced by the alleged deficiencies.  Indeed, Mr. Bennett testified
that he had no opinion as to prejudice because attempting to determine
what the Court of Special Appeals would have done with Petitioner's
appeal had the issues been briefed to his liking would be "too
speculative."  Accordingly, Petitioner is not entitled to relief on this
ground.

*Id.*, Exhibit 33 at 17-18.  In light of the deferential standard applicable to § 2254 review, the post-

conviction court's decision was neither contrary to, or involved an unreasonable application of,

clearly established federal law or was based on an unreasonable determination of the facts.  *See* 28

U.S.C. § 2254.  The Court concurs: Green has failed to establish prejudice with regard to the alleged

deficiencies on direct appeal.  Relief is not warranted on this ground.

(i)     Failure to Call Green's Civil Attorneys

Green argues that trial counsel should have called attorneys he had retained in a civil matter.

He claims they would have testified that had Green called they at the time of his arrest, they would

have advised him to give no statement without an attorney being present.  As found by the post-

conviction court, Green never informed anyone that he wanted to speak to his civil attorneys.  *Id.*,

Exhibit 33 at 18-19.  Relief will be denied on this ground.

(j)     Failure to Present Evidence Regarding Santana's Reputation for Violence

Green faults counsel for failing to bolster his theory of defense by introducing evidence of

Santana's reputation for violence.  He contends that such evidence would have helped establish his

state of mind and support his self-defense argument.  Specifically, he claims that Santana was a

known wife-beater.[19]

Green's legal expert testified on post-conviction that Maryland Evidence Rule 5-401(A) would permit a pertinent character trait of the victim to come before the jury in a case involving self-defense. The Rule permits both reputation and opinion evidence to be presented. The defense must have understood the Rule and the importance of calling such a witness, because it called Vincent Krug, whose sister lived with Green, to testify concerning Santana's threat to have the sister followed to determine where Green lived in order to coerce payment of nearly $1,000 owed for marijuana destroyed in a house fire. *Id*., Exhibit 16 at 180-81.

Throughout trial, defense counsel provided the jury with glimpses into Santana and Benkert's participation in the illegal drug trade in an attempt to portray them as perpetrators rather than victims and bolster Green's theory of self-defense. The contention that Santana's reputation should also have been impugned because he beat his wife appears to have no factual basis and provides no basis for habeas corpus relief.

(k.)     Failure to Object to Admission into Evidence of Duplicate Tapes

Next, Green contends that counsel was ineffective in failing to object to the admission into evidence of duplicates (rather than the originals) of the audio tapes of his statement to police.[20] At the post-conviction hearing, trial counsel conceded that he may not have heard the original tape and also conceded that Green told him: (i) the written transcript taken from the tapes was erroneous because he never indicated that he had kneed one of the victims and (ii) he believed the police talked

---

[19]     Nothing in Green's confession or the trial or post-conviction transcripts suggests that Santana beat his wife.

[20]     Duplicates of the tapes were admitted at trial. Additionally, a redacted portion of the tapes existed. Paper No. , Exhibit 32 at 111-119.

to him between the end of the first tape and the beginning of the second tape in order to "trip him up."  Paper No. 9, Exhibit 31 at 37, 39.  Green also may have indicated to counsel that some of the advisement of rights may have been excluded from the tape recordings.  *Id*., Exhibit 31 at 38.  The post-conviction court found no evidence suggesting the tapes had been altered or to cast doubt on the accuracy of the duplicates.  This Court agrees, and further finds that Green has failed to show he was prejudiced in any way as a result of the introduction of the tapes as evidence at trial.  Consequently, this claim provides no reason to disturb the decision of the post-conviction court.

 (l)  Failure to Present Witnesses To Testify as to Prior Threats Against Green

 As noted above, trial counsel called Vincent Krug to testify concerning a prior threat against Green.  The effectiveness of this testimony, however, may have been negated by Green's statement to the police in which he admitted that but for Santana "push[i]n' [the[ situation" he, Santana and Benkert would "still be friends today."  Paper No. 9, Supplemental Exhibit 42 at 44.  Green has failed to satisfy the *Strickland* analysis with regard to this claim, and relief shall be denied.

 (m.)  Failure to Impeach a Key State's Witness

 Green contends that counsel failed to impeach Corporal Forsythe by showing at trial that Forsythe – who was not a homicide investigator – was selected to drive Green to the district court commissioner in order to elicit a confession from him.  As noted by the post-conviction court, even if Forsythe,  the State Police officer whose primary job assignment was to pose as a "hit man" for those soliciting murder for hire, was brought in due to his ability to make Green feel at ease and elicit a confession from him, Forsythe's tactics did not run afoul of the Constitution, *Miranda*, and its progeny.

 (n)  Failure to be Familiar with Case Citation

Trial counsel admitted at the post-conviction hearing that he was caught off guard when the trial court asked questions about specific cases cited in the motion to remove.  As noted by the post-conviction court, this deficiency did not undermine the proper functioning of the trial.  *Strickland* simply is not satisfied: there is no showing of prejudice, nor any showing that counsel's conduct fell below the standard for effective representation.  Green has failed to show that the failure to remember case citation was so serious as to deprive him of a fair trial or a trial with an unreliable result.  *See Strickland*, 466 U.S. at 687.  Absent prejudice, Green has no basis for habeas corpus relief.

(o)      Failure to Introduce Key Evidence

At post-conviction, Green testified that he locked the basement door after Santana and Benkert chased him into the basement.  He also testified that they ripped open the locked door, breaking the lock and splintering the wooden door frame.  Paper No. 9, Exhibit 32 at 46, 56. Counsel obtained photographs and a videotape showing damage to the door and recovered wood from the splintered door, but did not introduce  them at trial to bolster Green's argument of self-defense.  *Id*., Exhibit 32 at 61.  He offered no explanation at the post-conviction hearing for his failure to introduce such physical evidence.  *Id*., Exhibit 31 at 87.

Green asserts that his testimony at trial was not needed to provide a basis for the introduction of such evidence, because his mother, Robin Ring, could have  testified concerning the condition of the door and lock.  At post-conviction, Ms. Ring testified that she had been in the house approximately four days prior to the incident and did not notice anything about the basement door. She further testified she reentered the house shortly after the incident to allow the police to enter and subsequently entered the house in February, 1995, to allow trial counsel to view the scene.  *Id*.,

-33-

Exhibit 30 at 223-226.  Nothing in her testimony reveals that the doorway was in fact intact prior to the incident or that she subsequently noticed damage to it and pointed it out to police, trial counsel, or counsel's criminal investigator.  In his confession, in which he details the sequence of events several times, Green fails to mention the door, instead indicating that he bolted down the basement stairs with Santana and Benkert in hot pursuit.  He indicates, however, that he had purchased paint for the walls and floor of the basement and sheet rock to repair a wall into which he was thrown.  No mention of repair to the door was made.

The Court disagrees with the post-conviction court's finding that this ground is not subject to post-conviction challenge because it involves trial strategy.  Nonetheless, it is apparent that Green is not entitled to habeas corpus relief under *Strickland*.

(p)     Cumulative Error found on the record before this Court.

Such error has not been found.  The cumulative effect of acts or omissions which themselves do not amount to ineffective assistance does not create a valid ineffective assistance claim.  *See Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998).

## Trial Court Error

(a)     Failure to Supress Statement.

Green asserts that the trial court erred in failing to suppress his statement to the police. Relying on the dissenting opinion rendered on direct appeal, Green claims that his waiver of his Fifth Amendment right to remain silent was not knowing and voluntary and that he was not provided with the requested counsel in a timely manner in violation of the Sixth Amendment.  The Court of Special Appeals examined this claim, and, despite a strongly worded dissent, found as follows:

## Failure to Grant Appellant's Motion to Suppress Tape Recorded Statement

The trial court denied appellant's motion to suppress the tape-recorded statement that was taken by the police on Saturday, December 17, 1994. In reviewing the correctness, *vel non*, of the trial court's ruling on the motion to suppress, the only relevant facts are those produced at the suppression hearing "'which are most favorable to the State as the prevailing part on motion.'" [Citations omitted]. With that test in mind, the relevant facts are set forth below.

On December 16, 1994, the day following the killings of Santana and Benkert, appellant arrived at his home about 9:00 p.m. to find police officers waiting. Appellant got out of his Ford Bronco and invited the police officers inside his home. Corporal Douglas Wehland, of the Maryland State police, asked appellant if he knew anything about the whereabouts of the missing men. Appellant told the police that Santana and Benkert had been to his house on December 15th but that he had not seen them since. After answering questions for about five minutes, Corporal Wehland asked appellant if the police could search his vehicle. Appellant hesitated and then said, "To be honest[,], I have some pot in the truck, and I don't want to cause a scene out there with my family in the truck.." Corporal Wehland suggested that appellant remove his family from the vehicle and bring them into the house so that the police could search the vehicle. Appellant agreed with this suggestion. While appellant was removing a "baby bag" from the truck, a police officer saw him hide a glassine bag of suspected marijuana in the bag. He was later observed attempting to hid the glassine bag behind an entertainment stand in his home. Appellant was arrested for possession of marijuana. He was then advised of his *Miranda* rights [footnote and citation omitted] by Maryland State Trooper Robert A. Lipsky.

Before police could search the Bronco, appellant asked Corporal Wehland if he could talk to an attorney. The request for an attorney was made by appellant in regard to the question as to "the consent search of his vehicle." Accordingly, the police delayed the search of the vehicle until a warrant could be obtained.

Appellant was driven to the Waterloo Barrack of the Maryland State Police by Trooper Dennis Deal. During the trip, appellant asked "generalized" questions of Trooper Deal, such as whether "he knew what was going on" and whether he knew what charges had been placed against him. Trooper Deal told appellant, I'm just a taxi cab driver....I'm not part of the investigation." Nevertheless, appellant continued to be "talkative" and to ask questions about his pending charges. Because of the continuing questioning, Trooper Deal pulled to the side of the road and once again advised appellant of his *Miranda* rights.

In the early morning hours of December 17th, a Statement of Charges was issued charging appellant with the murder of Santana and Benkert. The charges were based on information provided by appellant's girlfriend, who told the police that appellant had killed Santana and Benkert. She did not tell the police where ap-

pellant had buried the bodies.

Trooper Deal stayed with appellant during his processing at the Waterloo Barrack. Appellant, at that time, was provided with food and a soft drink and was placed in a cell. Also in custody at the Waterloo Barrack was one Marty Morse, another suspect in the disappearance of Santana and Benkert. Morse was appellant's cousin. At the request of another officer, Trooper Deal went to appellant's cell and call his (appellant's) name as Marty Morse walked past the cell. At 2:00 p.m., Trooper Deal took appellant to a processing room and told him that he wanted to ask a question. Appellant agreed to answer the question, and he once more was advised of his *Miranda* rights. Trooper Deal asked appellant if he knew Marty Morse. Appellant said, "No." Appellant then said that he wanted to talk to an attorney. The police asked no further questions that morning. [Footnote omitted].

About 5:45 a.m. on the 17th of December, Corporal Wehland called the Baltimore County Public Defender's Office with the intent of asking them to supply an attorney for appellant. He got no response; he called again, approximately two hours and forty-five minutes later, but again, he got no response. Late that afternoon, he contacted an "on-call" Baltimore County Assistant State's Attorney, Joseph Stegerwald. At the request of Corporal Wehland, the Assistant State's Attorney called the "on-call" Assistant Public Defender to request an attorney for appellant. Mr. Stegerwald was told that the public defender's office had no one presently available to talk to appellant but that someone from their office would speak with him on the following Monday, December 19th.

On the afternoon of December 17, 1994, appellant was transported by Trooper George Forsythe from the Waterloo Barrack to Towson for a bond hearing before a District Court commissioner. The only facts that Trooper Forsythe knew about the crimes of which appellant was accused were in the Statement of Charges. During the trip, appellant was handed a copy of the Statement of Charges and allowed to read the Statement. At the beginning of the trip, Trooper Forsythe told appellant, "We're going to be with each other for a while...I understand that you have asked for an attorney. So it is the best bet just not to talk about your case at all." He also said, "We can talk about anything else," but just avoid "any conversation" about your case. Appellant indicated that he understood, but appellant, nevertheless, leaned back at one point, signed, and said, "Well, my life is over." He then became "very upset" and appeared close to tears. Appellant said he had children, and he was worried about what would become of them. Trooper Forsythe commented:

> I don't know where you're going to end up, but it is my opinion that wherever you end up you can do something good with your life. That's just the way it goes, sometimes we do something in thirty minutes and our whole life is changed because of it, we just move on.

Appellant said, "Yeah, more like thirty seconds."  Appellant later said,"Can I ask you a question?"  Trooper Forsythe replied,

> Well, if it's about the case, first of all, I don't know much about it.  So there is not much that I can tell you about the case.  Additionally, you have asked for a lawyer and anything that you want to know about this case if it is a legal matter, your lawyer will know the answer; and if it's a technical matter, your lawyer will ask the police and get an answer for you.

Appellant then said, "This doesn't really involve my case."  Trooper Forsythe replied, "Well, again, if you ask me something technical about the case or if your question is a technical question, if I can't answer it, I'll be truthful and say I can't answer it.  I won't lie to you."  Trooper Forsythe next reiterated that, if appellant had any questions about his case, he should ask his lawyer.  Appellant then inquired, "What [is] the difference [for sentencing purposes] between first degree murder and murder in self defense?"  The trooper attempted to answer the question by using an example.  He told appellant:

> [I]n a first degree murder....First of all, in a trial you have a right to a jury and a jury is going to hear everything about the case....[A]n example of the first degree murder of murder would be the guy that the jury is listening and it's perhaps someone is having an affair or something along those lines, he was angry, he wanted to kill the guy, he found out where he lived, he planned it and plotted it out.... [An example of a] murder in a self-defense...[would be] somebody gets in a fight or they are attacked or their family is attacked and they have to do what they have to do to save their own life, save their own hide and they kill them....A jury listens to both of those....I don't know what the sentences are, but the second story, certainly they would be more lenient towards that.

The trooper also told appellant that:

> Everybody understand that in cases like this people panic....That doesn't apply in your particular case because nobody has found the bodies.

Trooper Forsythe explained to appellant that a jury would have "trouble believing a case of panic" if the police were to find the bodies, for example, five to seven days "from now."  In his words, "You would have to say that you panicked for seven days or five days or however long it takes to find the bodies, and they [the jury] would just have trouble believing it....The question would be, How long does panic go on?"  The officer then cautioned appellant "not to say anything" because he was not fooling him [footnote omitted] inasmuch as he did not believe the appellant was

talking about a hypothetical case but rather was talking about the matter for which he was charged.  Appellant gave no response to the officer's commentary.  According to Trooper Forsythe, this was not "an angry exchange" and afterward they segued to other subjects.

Trooper Forsythe testified that the only comments that appellant made pertaining to his case during the trip was that 1) he wanted to talk "to a public defender" and 2) he said "I would like to help you...[the police] but [I want] to talk to a public defender first."  To this, Trooper Forsythe replied that they were trying to find him a public defender but, so far, had been unsuccessful.

A bond hearing before a District Court commissioner took place at 4:30 p.m. on December 17th.  The hearing lasted between fifteen and twenty minutes.  At the hearing, appellant was advised by the commissioner that the maximum penalty for the crimes for which he had been charged was death.  Appellant was also advised by the commissioner that he had a right to an attorney.  Appellant, in turn, told the commissioner that he wished to speak with a public defender.

After the bond hearing, appellant advised Trooper Forsythe that he wanted to make a statement without a public defender being present.  This information was immediately conveyed to Trooper Wehland.

Appellant was interviewed by Corporal Wehland, Trooper Forsythe, and another police officer at 5:43 p.m. on December 17th.  Before commencing the interview, Corporal Wehland again advised appellant of his *Miranda* rights, which appellant acknowledged that he understood.  Appellant then waived each of those rights.  When asked by Corporal Wehland if he had "volunteered to talk to" the police, appellant said, "I volunteered it [sic].  I'll give you that."  He also acknowledged that he had not been threatened by the police and no promises or inducements were made to him by the police that convinced him to make the statement.

## DISCUSSION

### ISSUE I

In support of his contention that the trial judge erred in overruling his motion to suppress the taped confession, [Green] states:

> [Green] invoked his Fifth Amendment rights to be protected from self-incrimination on December 16, 1994 by asking Cpl. Weh-land, at the time of his arrest, to speak to an attorney.  *Fikes v. Alabama*, 352 U.S. 191 (1957); *Davis v. United States*, [512 U.S. 452](1994); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Bryant v. State*, 49 Md. App. 272 (1981); *State v. Quinn*, 64 Md. App. 668 (1985); *Conover v. State*,

-38-

312 Md.33 (1988).  No lawyer, nor access to a lawyer was provided to Green.  That Green's repeated request went unanswered for almost twenty-four hours is not the result, solely, of the actions or inactions of those who had him in custody.  Another arm of the State bears responsibility for depriving Green of access to an attorney over a weekend prior to being questioned, which is required under the United States' and Maryland's Constitutions.

Later, [Green] asserted:

> The conduct of Trooper Deal, Detective Forsythe and the act of providing Green with his Statement of Charges and the effect of the [c]ommissioner's reading [sic] that the possible penalties include the ultimate punishment of death are factors that under Maryland law mandate a finding that Green's statement is 1) violative of his right against self-incriminaion and 2) under the common law, involuntary.

A.  <u>Did the statement violate [Green's] right against self-incrimination by a delay in supplying counsel?</u>

The State did not violate [Green's] Fifth Amendment right against self-incrimination by failing to supply him with an attorney during the nineteen hours he was in custody prior to making a statement.  The *Miranda* case itself rejects the notion "that each police station must have a 'station house lawyer' present at all times to advise prisoners."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). [Green] wanted the aid of a public defender, and at the suppression hearing, it was proven that no public defender was available on December 17th.  Under the dictates of *Edwards v. Arizona*, 551 U.S. 477, 484-85 (1981), law enforcement officers may not question a suspect after the suspect invokes his right to counsel unless the suspect, on his own initiative, elects to give up his right to counsel or until a lawyer has been made available.  *Id*.  The "prophylactic purpose" of the *Edwards* rule is to prevent the police from badgering a suspect into waiving his previously asserted *Miranda* rights.  *Davis v. United States*, 512 U.S. 452, 458 (1994).  No one badgered [Green] into waiving his right to counsel.

B.  <u>Conduct of Trooper Deal, Trooper Forsythe, and the Commissioner</u>

In the case of *Ball v. State*, __ Md. __ (No. 59, Sept. Term 1996, slip op. at 10-11, filed Sept. 10, 1997), the Maryland Court of Appeals said:

> The introduction of a confession as evidence against the accused at trial is permitted only where it is determined that the confession was "'1) voluntary under Maryland non-constitutional law, 2) voluntary under

the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and 3) elicited in conformance with the mandates of *Miranda*.'" [Citations omitted].

[Green] acknowledges that he was properly advised of his *Miranda* rights prior to giving his statement.  Moreover, he does not dispute that he waived those rights.  Citing *Hof v. State*, 337 Md. 582, 595 (1995), he points out that all of the circumstances under which the statement was made, both before and after *Miranda* warnings were given, must be considered in determining voluntariness...."In deter-mining whether a confession is plagued with any 'coercive barnacles,' 'the standard ...is whether, under the totality of all the circumstances, the statement was given freely and voluntarily.'" [Citations omitted].

As already noted, [Green] asks us to consider what three persons did in determining voluntariness, i.e., the District Court commissioner, Trooper Deal, and Trooper Forsythe.

### The District Court Commissioner

[Green] correctly notes that the commissioner, at the bond hearing, told [him] that the maximum penalty he faced was death.  What [Green] fails to do is to put forth any argument as to how this fact made his subsequent tape-recorded statement involuntary.  The fact that a person faces the death penalty was a factor to be considered in setting bond.  The commissioner cannot be faulted for telling [Green] about this factor.  News that he might be punished with death might well have frightened [Green], but we can think of no reason why this would coerce [him] to involuntarily give the police a statement in which he admitted killing two men and burying their bodies.

### Trooper Deal

[Green] says the conduct of Trooper Deal should be considered in de-termining if [his] statement was voluntary.  Significantly, however, [Green] does not point to any action or inaction on Trooper Deal's part that he claims made his statement involuntary.  Given this oversight, it is difficult to grapple with this argument.  We have, nevertheless, reviewed the testimony regarding Trooper Deal's conduct.  That conduct was exemplary with one exception, i.e., he asked [Green] if he knew Marty Morse after [Green] had invoked his right to counsel and <u>before</u> [Green], <u>on his own initiative</u>, elected to talk to the police.

Trooper Deal's actions in this regard would have made [Green's] state-ment that he did not know Marty Morse inadmissible under *Edwards*, but at trial the State made no attempt to show that [Green] denied knowing his own

-40-

cousin.  This lapse in Trooper Deal's part took place over thirteen hours prior to [Green] giving his taped statement to the police; moreover, after this lapse [Green] was warned several times that he was not obliged to talk to the police without the presence of counsel.  Under these circumstances, Trooper Deal's actions did not make [Green's] statements involuntary.

### Trooper Forsythe

The only direct criticism of Trooper Forsythe's actions made by [Green] in his brief is that he gave [Green] a copy of the Statement of Charges when he transported him to the Towson bond hearing.  Besides telling us that this is a factor to be weighed in determining "voluntariness," [Green] does not provide even a hint as to what weight he believes the conduct should be given.  We believe the conduct should be given no weight on the scales of voluntariness. [Green], like any other citizen, had a right to know why the police are holding him in custody.  When, as here, a person is arrested without a warrant, Maryland Rule 4-212(e) requires that the police deliver to the accused a copy of the Statement of Charges. [Citation omitted].  Delivery of the Statement of Charges to an accused after he has invoked his *Miranda* rights does not invite comment by the prisoner or otherwise infringe upon the right of an accused to counsel. [Citation omitted].

In regard to Trooper Forsythe's actions, [Green] says in the "Facts" section of his brief that Forsythe testified that he told [Green] that 1) a jury would not believe that...[Green] acted in self-defense if...[Green] withheld information from the police about the whereabouts of the bodies" and 2) "Panic could explain certain actions, but that an explanation from...[Green] that he panicked would not be believed by a jury if...[Green] did not disclose the whereabouts of the two bodies promptly."   Although he does not mention this testimony in the "Argument" section of his brief, [Green] impliedly asks us to consider this testimony when ascertaining whether the taped statement was given involuntarily.  This request must be denied, based on the indisputable fact that Trooper Forsythe gave no such testimony at the suppression hearing.  What Trooper Forsythe actually testified to has already been related, and as can be seen, Trooper Forsythe simply did not testify that he told [Green] that the jury would not believe that he panicked if he did not promptly disclose the whereabouts of the bodies.

In denying [Green's] motion to suppress, Judge Smith found:

Now, [Green] has the right, even after invoking his Fifth Amendment right to counsel and even after being charged, to talk to the police without an attorney if he so chooses.  In my judgment for reasons of his own, namely the death penalty, his concern that he may be permanently separated from his girlfriend and his children

-41-

or for whatever other reasons, [Green] had determined it was in his interest to talk to the police and elected to do so.  The statements which he made were not in violation of any Fifth Amendment rights and were clearly not in violation of any Sixth Amendment rights that attached following the bail hearing at approximately ten minutes of five on December the 17th.

[Green], all the way up from going into the bail hearing, was in control of himself.  It is clear by his own testimony as to avoiding questions or not answering questions, even with regard to the small talk that occurred according to his testimony immediately prior to the bail hearing itself.  It was only after what the Commissioner told him that [Green] decided that he wanted to talk to the police whether he could have a Public Defender or whether he could not have a Public Defender, he wanted to talk to them regardless.  There was much passage of time even between his telling Trooper Forsythe of his desire to talk to the police after the bail hearing up until the bail hearing up until the bail hearing actually started some hour later following his transport back to the barracks and again there is just no evidence in this case of the police efforts to get [Green] to talk about [sic] a lawyer.  Their efforts were to get a lawyer so that they could talk to [Green].

We hold that Judge Smith did not err in finding that the statement was voluntary and was not obtained in violation of [Green's] rights against self-incrimination.

### C.    Sixth Amendment Right to Counsel

In regard to [Green's] Sixth Amendment right to counsel, [Green] merely says:

Finally Green invoked his Sixth Amendment right to counsel on December 17, 1994 in front of the Commissioner and Detective Forsythe.  *Massiah v. United States*, 377 U.S. 201 (1964); *Brewer v. Williams*, 430 U.S. 387 (1977); *Brown v. State*, 79 Md.App. 163 (1989).

The Sixth Amendment right to which [Green] refers was explained in *Brown v. State*, 79 Md.App. 163, 168 (1989):

Once a defendant requests a lawyer, subsequent advisement of constitutional rights followed by acquiescence in a police-initiated questioning cannot establish a valid waiver of the Sixth Amendment right to assistance of counsel. [*Michigan v. Jackson*, 472 U.S. 625],

-42-

106 S.Ct. [1404], 1410 [(1986)].  "Just as written waivers are insuffi-
cient to justify police initiated interrogations after the request for
counsel in a Fifth Amendment analysis, so too are they insufficient to
justify police initiated interrogations after the request for counsel in a
Sixth Amendment analysis."  *Id*.  Brown's oral waiver was likewise
insufficient.

   In *Brewer v. Williams*, 430 U.S. 387, 51 L.Ed.2d 424, 97 S.Ct.
232 (1977).  Where, as in *Massiah v. United States*, 377 U.S. 201, 12
L.Ed.2d 246, 84 S.Ct. 1199 (1964), the Sixth Amendment right to coun-
sel had accrued, the Court held that a valid waiver of counsel rights should
not be inferred from the mere response by the accused to overt or more
subtle forms of interrogation or other efforts to elicit incriminating infor-
mation.  In *Massiah* and *Brewer*, counsel had been engaged or appointed
and the admissions in question were elicited in his absence.
*Edwards v. Arizona*, 451 U.S. at 484 n.8, 101 S.Ct. At 1885 n.8.

        The taped statement here at issue was not the result of police-initiated
questioning or of subtle forms of interrogation or other efforts to elicit incriminating
information.  According to evidence believed by the trial judge, it was [Green] who
initiated questioning by stating that he wanted to talk to the police.  This was con-
firmed by [Green] on the tape, after he was readvised of his *Miranda* rights and after
he acknowledge that he wanted to give a statement without the presence of counsel.
Under all the circumstances recited above, the trial court did not err in denying
Green's motion to suppress his taped statement.

*See* Paper No. 9, Exhibit 26 at 3-17.

        Citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) and *Colorado v. Spring*, 479 U.S.

564, 575 (1987), Green argues that he had invoked his right to counsel on several occasions to

no avail.  He notes the dissenting opinion on direct appeal, in which Judge Thieme found a

violation of the Fifth Amendment based on the fact that Green twice requested counsel prior to

giving a statement and that after seventeen hours counsel had yet to be provided.  Because

counsel was not provided, Judge Thieme held that Green's statement was involuntary and should

be suppressed.

        After a knowing and voluntary waiver of rights under *Miranda*, law enforcement officers

may continue questioning until and unless a suspect clearly requests an attorney.  If a suspect invokes the right to counsel at any time, the police must immediately cease questioning until an attorney is present.  *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  The *Edwards* rule prevents police from badgering a suspect into waiving previously-asserted *Miranda* rights, and its applicability requires courts to determine objectively whether the accused actually invoked his right to counsel; it does not, however, require that officers stop questioning the suspect where a reference to obtaining counsel is ambiguous or equivocal.  *See Davis v. United States*, 512 U.S. 452, 453 (1994).

Even were this Court to assume that Trooper Forsythe was tasked with driving Green to the commissioner because of his skill in putting suspects at ease and getting them to talk, the fact remains that Green, not Forsythe, repeatedly initiated and questioned Forsythe about the elements of murder and self-defense.  Green's conversation persisted despite Forsythe's admonition that he "not talk about [Green's] case at all" and advice that he limit conversation to topics other than the case because Green had "asked for a lawyer." [21]   Green's actual confession did not occur until he arrived back at the Waterloo barracks and only after he was again advised of his right to remain silent until consulting with counsel.[22]  The conclusion concerning the

---

[21]     In attempting to differentiate between first degree murder and murder committed in self-defense, Forsythe did discuss "panic," stating that a jury would have "trouble believing a case of panic" if the police were to find the bodies days later, the question being "[h]ow long does panic go on?"  Forsythe immediately warned Green "not to say anything" because it was apparent that Green was not talking about a hypothetical case but rather was talking about the matter for which he had been charged.  This exchange ended the legal discussion, and Green and Forsythe then discussed other matters.

[22]     Before recording the confession, Corporal Wehland not only provided Green another *Miranda* warning, but also referenced Green's earlier reluctance to speak without consulting counsel.  Green admitted that he wanted to answer questions earlier, but just wanted to talk with an attorney first. He then agreed to talk without the presence of counsel, so that he could "give [his] version" of what had occurred.  Paper 22, Supplemental Exhibit 42 at 2-3.

voluntariness of Green's conviction reached by the state court is factually supported and does not run afoul of Supreme Court precedent.  This ground presents no basis for reversal of Green's conviction.

### (b.)    Failure to Grant Second Request for Removal

In his final claim, Green contends that the trial court erred in denying his second motion for removal based on prejudicial pre-trial publicity in violation of *Sheppard v. Maxwell*, 384 U.S. 333, 364 (1966).  The Court of Special Appeals, examining this claim on direct appeal, relied upon state law in determining that Carroll County jurors were not prejudiced against Green.  Specifically, the Court of Special Appeals held as follows:

> [Green] contends that Judge Smith abused his discretion when he failed to grant his second request for removal.  In support of this contention, [Green] points out:
>
> 1.    The state charged that Sabrina's kidnaping took place in Carroll County;
>
> 2.    Santana, Benkert, and Sabrina were all residents of Carroll County;
>
> 3.    Thirteen newspaper articles concerning [Green's] case were published in Carroll County newspapers prior to trial;
>
> 4.    The 13 newspaper articles set forth the alleged facts of his case, the victims' families' wish that [Green] receive a penalty of death, the fact that a young female child had been "kidnapped," and the fact that the case had been removed from Baltimore County to Carroll County;
>
> 5.    Of 168 original veniremen, 38 jurors responded that they had received information about appellant's case from some media or other non-judicial source;
>
> 6.    After strikes for cause, 68 veniremen remained.  Of those 68, 11 had been subjected to at least some media exposure to the facts, or alleged facts, of appellant's case.
>
> The trial judge did not rule upon appellant's removal until after the jury had been

chosen.  At that point, the court had the opportunity to consider answers given by prospective jurors to extensive voir dire.  The court was in a position to make an informed judgment as to whether appellant could get a fair trial before that jury panel.  Determination of appellant's second request for removal was committed to the sound discretion of the trial court. [Citations omitted].  After a defendant in a capital case has been afforded his right to automatic removal, in order to obtain further removal, the movant bears the same burden as a defendant in a non-capital case.  In seeking a second removal, the burden rested upon the defense to show that absent the granting of the motion he would be prevented from receiving a fair trial.

Prospective jurors are not required to be totally ignorant of the issues and circum-stance surrounding the case. [Citation omitted].  "'It's sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court..'" [Citations omitted].  Accordingly, as this Court has recognized, '"Voir dire examination is usually a sufficient mechanism to insure that a defendant obtains a fair and impartial trial despite the pretrial publicity.'" [Citations omitted].

Appellate review of the denial of a change of venue "is limited to consideration of whether the party seeking removal has met the burden of showing that 'he has been prejudiced by adverse publicity and that the voir dire examination of prospective jurors, available to him, would not be adequate to assure him a fair and impartial trial.'" [Citations omitted].

In denying appellant's request for removal, the trial court noted, in response to a suggestion by appellant's counsel that "a segment of the literate population were excluded," that twenty-six of the fifty-eight prospective jurors had college or graduate school education, and that only one qualified juror had less than a high school education.  The trial judge also noted that he had specifically included an additional voir dire question to address appellant's "concerns about the Carroll County victims and the Baltimore County defendant."  The trial court summarized its reasons for denying appellant's motion when it said, in part:

> So, the answer is there is no reason that the case should not proceed here.  If there were, I would rule favorably on your motion.  I reserved on your motion to see if, in fact, I was going to perceive a problem.  I perceived no problem whatsoever.  I think that the voir dire has been, I think, in depth.  I have tried to pursue in depth questions when any juror indicated any response that in my judgment should have been pursued.
>
> I believe that the qualified juror pool that we have has none of the subtle concerns evidence that you are worried about.  Certainly those who have any familiarity from publicity that were in any way affected by it I eliminated from the potential pool and that your client

is positioned to have fair and impartial deciders determine his case.

It is evidence that the trial judge carefully considered the removal issue. Appellant failed to prove that any potential juror in the pool of sixty-eight were prejudiced against him by the fact that the victims of the crimes were residents of Carroll County or by the fact that some of the prospective jurors had been exposed to pretrial publicity. Therefore, appellant failed to prove that the trial judge abused his discretion in failing to remove the case from Carroll County.

Paper No. 9, Exhibit 26 at 17-20.

A criminal defendant has the constitutional right to a fair and impartial jury. *See Irvin v. Dowd*, 326 U.S. 717, 722-23 (1961) (juror presumed impartial and existence of preconception is insufficient to rebut presumption if juror can lay aside impression or opinion and render verdict based on evidence); *Patton v. Yount*, 467 U.S. 1025 (1984) (question of juror's partiality is factual, and state court determination is entitled to presumption of correctness). Green has failed to demonstrate that holding the trial in Carroll County impermissibly tainted the jury. The state appellate court's ruling on this claim withstands review under 28 U.S.C. § 2254(d).

For the foregoing reasons, the instant Petition for Habeas Corpus Relief is denied and dismissed. A separate Order shall be entered accordingly.


 May 19, 2006                                         _____/s/_____
Date                                                          William D. Quarles, Jr.
                                                              United States District Judge